IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| LEROY NOT AFRAID and GINGER GOES AHEAD, | CV-19-100-BLG-SPW-TJC |
| Plaintiffs, | **FINDINGS AND RECOMMENDATIONS OF U.S. MAGISTRATE JUDGE** |
| vs. | |
| UNITED STATES OF AMERICA, and LOUISE ZOKAN-DELOS REYES, in her official and individual capacity, and JO-ELLEN CREE, in her official and individual capacity, | |
| Defendants. | |

Plaintiffs Leroy Not Afraid ("Not Afraid") and Ginger Goes Ahead ("Goes Ahead") filed this action against the United States of America ("United States"), and Louise Zokan-Delos Reyes and Jo-Ellen Cree ("Individual Defendants"), alleging various causes of action relating to their termination from the Tribal Court of the Crow Tribe of Indians in late 2018.  (*See generally* Doc. 4.)

Before the Court are the United States and the Individual Defendants' respective Motions to Dismiss.  (Docs. 13, 18.)  The United States moves to dismiss Plaintiffs' claims in Counts II through VIII of the Amended Complaint under Fed. R. Civ. P 12(b)(1) for lack of subject matter jurisdiction and Rule 12(b)(6) for failure to state a claim.  The Individual Defendants also move to

dismiss Count I of the Amended Complaint under Fed. R. Civ. P 12(b)(6).  (Doc. 18 at 2.)

This matter is fully briefed, and for the following reasons, the Court recommends the United States' motion be GRANTED, and the Individual Defendants' motion be GRANTED with respect to Count I of the Amended Complaint.

## I.    Factual Background[1]

Pursuant to the Indian Self-Determination and Education Assistance Act ("ISDEAA"), the Crow Tribe entered into a "638" or "self-determination" contract ("Contract") with the Department of Interior ("DOI"), Bureau of Indian Affairs ("BIA"), effective October 1, 2011.  (Doc. 4 at ¶ 15.)  The purpose of the Contract was to provide federal funding to the Tribe's Judicial Branch for its court system and related programs.  (*Id.* at ¶¶ 13-16; *see also* Doc. 4-1.)  The Contract required an annual review of the Tribe's compliance with its terms for each fiscal year. (Doc. 4 at ¶ 17.)  At issue here is the review for fiscal year 2017, which began on October 1, 2016 and ended September 31, 2017.  (*Id.* at ¶ 18.)

---

[1] Motions to dismiss under Fed. R. Civ. P. 12(b)(1) and (6) accept as true all factual allegations set out in the complaint, draw inferences in the light most favorable to the plaintiff, and construe the complaint liberally.  *Cedars–Sinai Medical Center v. Watkins*, 11 F.3d 1573, 1583 (Fed. Cir. 1993), *cert. denied*, 512 U.S. 1235 (1994); *Barker v. Riverside Cty. Office of Educ.*, 584 F.3d 821, 824 (9th Cir. 2009); *Rescuecom Corp. v. Google Inc.*, 562 F.3d 123, 127 (2d Cir. 2009).

The Individual Defendants conducted the FY-2017 review as DOI employees on December 5 and 6, 2017; Reyes is the Rocky Mountain Region Indian Services Officer, and Cree is the Rocky Mountain Region Tribal Operations Officer.  (*Id*. at ¶¶ 7-8, 18.)  After the Individual Defendants completed their review, they compiled the Awarding Official's Technical Representative report ("Report") and accompanying Corrective Action Plan.  (*Id.* at ¶ 19.)  On January 8, 2018, the Individual Defendants submitted the Report to BIA Regional Director Darryl LaCounte, who in turn provided the materials to Crow Tribal Chairman Alvin "A.J." Not Afraid ("Chairman") and Chief Judge Leroy Not Afraid.  (*Id.* at ¶ 20.)

In forwarding the Report, LaCounte summarized the non-compliance with the Contract, as well as with Crow Tribe Personnel Policies and Procedures, relating to deficiencies in hiring, payroll, salaries, and work environment.  (*Id.* at ¶ 21; *see* Doc. 4-2 at 1.)  The non-compliance required implementation of the Corrective Action Plan, which prescribed corrective actions and target dates for bringing the Tribal Court back into compliance with the Contract.   (Doc. 4 at ¶ 21; *see* Doc. 4-2 at 1-3.)

Plaintiffs Not Afraid and Goes Ahead are the former Chief Judge and Court Administrator for the Tribal Court of the Crow Tribe of Indians, respectively. (Doc. 4 at ¶¶ 4, 5.)  In response to the Report, Chief Judge Not Afraid wrote a

rebuttal letter to the Chairman on February 2, 2018, disputing the Report's findings, asserting that the review was conducted improperly, and referencing various attachments that illustrated the Report's "falsity." (*Id.* at ¶ 37.) The Chairman forwarded Not Afraid's rebuttal letter to LaCounte along with his own letter, which largely concurred with the Report's findings. (*Id.* at ¶ 38; *see* Docs. 4-3, 4-4.) The Chairman's letter stated an intent to bring the Tribe back into compliance with the Contract by implementing the Corrective Action Plan. (Doc. 4 at ¶ 38; *see* Doc. 4-4.)

Plaintiffs allege that BIA officials subsequently instructed the Chairman to terminate Plaintiffs, threatening the loss of the Contract if the terminations did not occur. (Doc. 4 at ¶ 119.) A petition was then filed by an Associate Judge of the Crow Tribal Court with the Judicial Ethics Board of the Crow Tribe, seeking Plaintiffs removal. (*Id.* at ¶ 120.) According to Plaintiffs, the allegations in the petition corresponded to the alleged deficiencies noted in the Report. (*Id.* at ¶ 128.) The Ethics Board recommended Plaintiffs removal. (*See* Doc. 1-6 at ¶ 52.) The Crow Tribal Legislature accepted the recommendation, and Plaintiffs were terminated from their positions with the Crow Tribal Court. (Doc. 4 at ¶ 127.)

Plaintiffs proceeded to file the instant action, arguing that the alleged deficiencies outlined in the Report were the result of the Individual Defendants'

false accusations, "largely fabricated and unverified factual findings," and

negligent misinterpretation of relevant Tribal law. (*Id.* at ¶¶ 22, 24, 40.)

Plaintiffs' Amended Complaint asserts eight counts against the United States

and the Individual Defendants. Plaintiffs first assert a *Bivens* claim against the

Individual Defendants for alleged violations of Plaintiffs' First and Fifth

Amendment Rights (Count I) (*Id.* at ¶¶ 135-142). Plaintiffs also assert the

following tort claims, apparently against all Defendants: breach of fiduciary duty

(Count II) (*Id.* at ¶¶ 143-147); negligent infliction of emotional distress (Count III)

(*Id.* at ¶¶ 148-151); constructive fraud (Count IV) (*Id.* at ¶¶ 152-155); negligence

(Count V) (*Id.* at ¶¶ 156-161); interference with contractual relations (Count VI)

(*Id.* at ¶¶ 162-166);[2] breach of the implied covenant of good faith and fair dealing

(Count VII) (*Id.* at ¶¶ 167-170); and punitive damages for actual fraud (Count

VIII) (*Id.* at ¶ 172).

## II.   Standard of Review

As noted above, Defendants bring their motions to dismiss under both Fed.

R. Civ. P. 12(b)(1) and 12(b)(6).

/ / /

/ / /

---

[2] Plaintiff has conceded that this claim is precluded by the intentional torts exception to the Federal Tort Claims Act, and consents to its withdrawal or dismissal. (Doc. 20 at 9, FN 1.)

### A.    Rule 12(b)(1)

Fed. R. Civ. P. 12(b)(1) governs a motion to dismiss for lack of subject matter jurisdiction.  Fed. R. Civ. P. 12(b)(1); see *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 435 (2011).  As the party asserting jurisdiction, the plaintiff bears the burden of proving its existence.  *Kingman Reef Atoll Investments, L.L.C. v. United States*, 541 F.3d 1189, 1197 (9th Cir. 2008.)  A defendant may pursue a Rule 12(b)(1) motion to dismiss either as a facial challenge to the jurisdictional allegations of a pleading, or as a substantive challenge to the facts underlying those allegations.  *Savage v. Glendale Union High School, Dist. No. 205, Maricopa Cty.*, 343 F.3d 1036, 1039 (9th Cir. 2003). A facial challenge contests whether the allegations "are insufficient on their face to invoke federal jurisdiction."  *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).  The challenge does not involve resolution of factual disputes; it only concerns the allegations in the complaint.  *Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004).  Here, the United States brings a facial challenge to jurisdiction.  Therefore, the Court must assume the allegations in the Amended Complaint are true and "draw all reasonable inferences in [plaintiff's] favor."  *Id.*

### B.    Rule 12(b)(6)

Fed. R. Civ. P. 12(b)(6) governs a motion to dismiss for failure to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  "Dismissal

under Rule 12(b)(6) is proper when the complaint either (1) lacks a cognizable legal theory or (2) fails to allege sufficient facts to support a cognizable legal theory." *Zixiang Li v. Kerry*, 710 F.3d 995, 999 (9th Cir. 2013) (quoting *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008)).

The Court's standard of review under Rule 12(b)(6) is informed by Rule 8(a)(2), which requires that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 677–678 (2009) (quoting Fed. R. Civ. P 8(a)).  A district court must first accept as true all well-pleaded factual allegations and draw reasonable inferences from the complaint in the non-moving party's favor.  *Id*. at 678.  To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*.  A plausibility determination is context specific, and courts must draw on judicial experience and common sense in evaluating a complaint.  *Levitt*, 765 F.3d at 1135.

## III.  Discussion

The United States moves to dismiss Counts II - VIII for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1), citing the intentional torts and

discretionary function exceptions to the Federal Tort Claims Act's ("FTCA")

waiver of sovereign immunity.  (Docs. 13; 14 at 11.)  Alternatively, the United

States moves to dismiss these claims under Rule 12(b)(6) for failure to state claim.

(*Id.*; Doc. 14 at 23.)  The Individual Defendants also move to dismiss Plaintiffs'

*Bivens* claim (Count I) under Rule 12(b)(6), arguing that Plaintiffs do not have a

cognizable claim under *Bivens*.  (Doc. 18.)

Plaintiffs assert subject matter jurisdiction under the FTCA, arguing the

FTCA exceptions the United States seeks to invoke do not apply.  (Doc. 4 at 1;

Doc. 20 at 7, 9.)  Plaintiffs also argue they have asserted a cognizable *Bivens* claim

under the theories of retaliation for the exercise of their First Amendment rights

and procedural due process violations under the Fifth Amendment.  (*Id.* at 17-18;

Doc. 22 at 10.)

The Court will address each motion in turn.

**A.    Jurisdiction of Tort Claims Against United States (Counts II-VIII)**

The United States, as a sovereign, is absolutely immune from suit unless it

has expressly waived its immunity and consented to suit.  *United States v. Shaw*,

309 U.S. 495, 500-501 (1940); *FDIC v. Meyer*, 510 U.S. 471 (1994).   The waiver

cannot be implied; it must be unequivocally expressed.  *United States v. King*, 395

U.S. 1, 4 (1969).  The existence of such consent is a prerequisite for jurisdiction.

*United States v. Mitchell*, 463 U.S. 206, 212 (1983).   Even where Congress has

8

waived sovereign immunity, the waiver must be strictly construed in favor of the United States, and cannot be "enlarged beyond what the [statutory] language requires …" *United States v. Nordic Village Inc.*, 503 U.S. 30, 34 (1992). Therefore, any case against the United States requires an analysis of whether, and to what extent, the United States has waived its sovereign immunity and permitted the suit.

Plaintiffs assert multiple state law tort claims against the Defendants in Counts II through VIII of the Amended Complaint.  The FTCA waives sovereign immunity for certain torts committed by federal employees, and provides "[t]he United States shall be liable … in the same manner and to the same extent as a private individual under like circumstances …"  28 U.S.C. § 2674.  The FTCA also grants exclusive jurisdiction of such claims in federal district court, providing that "the district courts … shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages … for injury … caused by the negligent or wrongful act or omission of any employee … under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."  28 U.S.C. § 1346(b).  The United States Supreme Court has interpreted the "law of the place," in Section 1346(b), as referring to the law of the state where the act or omission occurred. *Meyer*, 510 U.S. at 478.

9

The FTCA also contains several express exceptions that further define the parameters of the FTCA's waiver of sovereign immunity and limit a court's jurisdiction.  *See* 28 U.S.C. § 2680.  If any of these exceptions apply, a court must dismiss the claim for lack of subject matter jurisdiction.  See *Kelly v. United States*, 241 F.3d 755, 760 (9th Cir. 2001).

The United States relies on two exceptions to the FTCA to argue that all of Plaintiffs' tort claims should be dismissed for lack of subject matter jurisdiction. (Doc. 14 at 16-17.)  First, the United States argues that Plaintiffs' claims sound in defamation and therefore fall within the FTCA's intentional torts exception.  (*Id.* at 17.)  Second, Defendants argue that the acts upon which Plaintiffs' tort claims are based fall within the FTCA's discretionary function exception.  (*Id.* at 20.)

## 1.    Intentional Torts Exception

The intentional torts exception carves out from the FTCA's general waiver of sovereign immunity "[a]ny claim arising out of … libel, slander, misrepresentation, deceit, or interference with contract rights …"  28 U.S.C. § 2680(h).  Whether a claim "arises out of" one of § 2680(h)'s enumerated intentional torts requires an examination of the challenged conduct itself, rather than simply accepting a plaintiff's labeling of the conduct in the complaint.  *Sabow v. U.S.*, 93 F.3d 1445, 1456 (9th Cir. 1996), *as amended* (Sept. 26, 1996); see also *Mt. Homes, Inc. v. U.S.*, 912 F.2d 352, 356 (9th Cir. 1990); *Thomas-Lazear v. FBI*,

851 F.2d 1202, 1207 (9th Cir. 1988). Regardless of how the claim is labeled, if there is no actionable injury in the absence of conduct which constitutes one of the enumerated intentional torts, the exception applies. See e.g., *Mt. Homes*, 912 F.2d at 356.

In Montana, either libel or slander effect a claim for defamation. Mont. Code Ann. § 27-1-801. Libel is a "false and unprivileged publication by writing, printing … or other fixed representation that exposes any person to hatred … or causes a person to be shunned … or that has a tendency to injure a person in the person's occupation." Mont. Code Ann. § 27-1-802. Slander is a "false and unprivileged publication other than libel that … tends directly to injure a person in respect to the person's office … or by natural consequence causes actual damage." Mont. Code Ann. § 27-1-803.

Plaintiffs' allegations in the Amended Complaint regarding Defendants' conduct and intentions during the Review sound repeatedly, and at length, in libel and slander. All claims are premised on the same alleged "false" and "fabricated" accusations and findings in the Report. (*See e.g.* Doc. 4 at ¶¶ 22, 24.) Plaintiffs allege the Report was based on "false accusations," intended to "usurp…autonomy and authority," and contained "largely fabricated and unverified factual findings." (*Id.* at ¶¶ 22-24; *see also* ¶¶ 45, 55-56, 63, 66, 71, 75, 77, 80-81, 84-85, 92, 93, 114, 117-118, 130-132.). Therefore, regardless of the label attached to each claim,

11

all the claims in Counts II through VIII are based on an alleged false and
unprivileged written publication that injured Plaintiffs in their occupation, and thus
arise out of defamation.

This case is similar in many respects to *Hoesl v. United States*, 629 F.2d 586
(9th Cir. 1980).  In *Hoesl*, a civilian naval engineer was fired based on a report
written by a Navy psychiatrist.  *Hoesl*, 629 F.2d at 586-587.  After administrative
review, reinstatement, and the award of partial back pay, the plaintiff (Hoesl) filed
an action seeking the remainder of his back pay, costs, and damages.  *Id.* at 587.
Hoesl framed his claims as medical malpractice claims, but the district court
concluded that the claims were properly characterized as defamation.  *Id.*; see also
*Hoesl v. United States*, 451 F. Supp. 1170, 1174 (N.D. Cal. 1978).  The Ninth
Circuit affirmed, holding that Hoesl's "injury resulted from the use of a report by
supervisors in making a personnel decision," not from treatment based on a
negligent medical examination.  *Hoesl*, 629 F.2d at 587.  The same is true here.  In
the absence of the publication of the alleged false accusations in the Report,
Plaintiffs would have suffered no injury and would have no viable claim against
the United States.

Plaintiffs contend that *Hoesl* is inapplicable, arguing they have alleged facts
and duties that support claims other than defamation.  (Doc. 20 at 11-12.)  In
support, Plaintiffs advance *Jefferson v. Harris*, 170 F. Supp. 3d 194 (D.D.C. 2016),

12

for the proposition that even though their claims possess characteristics of defamation, they are "attacking … also [their] loss of employment and the inadequacy of procedural protections available for challenging the accusations levied against [them]," as well as "violations of tribal sovereignty and the rights of tribal members." (*Id.* at 11, citing *Jefferson*, 170 F. Supp. at 206) (alterations original)).

*Jefferson* is clearly distinguishable from the present case. The plaintiff in *Jefferson* brought claims under the APA, the Due Process Clause of the Fifth Amendment, and the Inspector General Act, as well as a *Bivens* claim. *Jefferson*, 170 F. Supp. 3d at 202-203. In determining whether Jefferson's claims were barred by the FTCA's intentional torts exception, the court looked to the nature of Jefferson's claims and the remedies sought, which included "a wide range of injunctive remedies.'" *Id.* at 206 (quoting *Liff v. Office of the Inspector Gen. for the U.S. Dep't of Labor*, 156 F. Supp. 3d 1, 11 (D.D.C. 2016), *on reconsideration in part*, 2016 WL 6584473 (D.D.C. Nov. 7, 2016), *rev'd sub nom.* 881 F.3d 912 (D.C. Cir. 2018), *rev'd sub nom.* 881 F.3d 912 (D.C. Cir. 2018) (reversals on other grounds). The court recognized that "if Jefferson 'had limited [his] Complaint to seeking damages resulting from "defamation by the government … alone," the FTCA exceptions would apply. *Id.* Instead, the court found that because Jefferson

also sought injunctive relief for loss of employment and inadequate procedural protections, the FTCA exceptions did not apply. *Id.*

Here, Plaintiffs only seek money damages against the United States for state law tort claims. (Doc. 4 at ¶¶ 151, 155, 161, 170, 173, 174-177.)  The only potential waiver of sovereign immunity for such claims is the FTCA.  Unlike *Jefferson*, Plaintiffs have not pled claims under the APA to challenge procedural deficiencies, and do not seek any injunctive or non-monetary relief.

Therefore, the Court recommends dismissal of Counts II - VIII against the United States for lack of subject matter jurisdiction under the FTCA's intentional torts exception.

### 2.    Discretionary Function Exception

The Court also finds that Plaintiffs claims against the United States fail under the FTCA's discretionary function exception.  This exception limits the FTCA's waiver of sovereign immunity where claims are "based upon the exercise or performance … [of] a discretionary function or duty of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a).  When the discretionary function exception applies, federal courts do not have subject matter jurisdiction over the matter.  *Sabow*, 93 F.3d at 1451; *In re Glacier Bay*, 71 F.3d 1447 (9th Cir. 1995); *Lesoeur v. U.S.*, 21 F.3d 965 (9th Cir. 1994).

14

A two-step analysis is used to determine whether the discretionary function exception applies. *Sabow*, 93 F.3d at 1451.  The first step asks whether the challenged conduct involves "an element of judgment or choice." *Id.* (quoting *United States v. Gaubert*, 499 U.S. 315, 322 (1991)).  Where federal law or policy specifically prescribes a course of action for the employee, the exception will not apply because the employee has no rightful option to exercise discretion. *Id*; see also *Berkowitz v. U.S.*, 486 U.S. 531, 536 (1988).  If the challenged conduct involves an element of choice or judgment, then the second step asks, "whether that judgment is of the kind that the discretionary function was designed to shield." *Gaubert*, 499 U.S. at 322-23.  The exception only protects government actions and decisions based on considerations of social, economic, or political policy.  *Id.*

As to the first step, the United States argues that as representatives of the DOI, the Individual Defendants' duties in carrying out the annual audit necessarily involved substantial discretion and professional judgment or choice.  (Doc. 14 at 21-22.)  Plaintiffs appear to concede the first prong as they do not raise an argument that any law or policy exists that would render the Individual Defendants' conduct non-discretionary.  (*See generally* Doc. 20 at 12-17.)  While the Contract mandates the review itself, no law or policy[3] prescribes a specific course of action for the BIA or its representatives to follow in undertaking that

---

[3] *See generally* Contracts Under ISDEAA, 25 C.F.R. pt. 900 (2020).

review.  (*See* Doc. 14-1 at 15, § 4.2; 25 C.F.R. § 900.46.)  Thus, the Court finds the first prong of the discretionary function exception is met.

With respect to the second step, the United States argues that because the Individual Defendants' duties required them to "assess whether government funds were being used and accounted for in compliance with federal regulations and the terms of the contract," the review necessarily involved considerations of public and economic policy and are thus protected by the discretionary function exception. (Doc. 14 at 22.)  In support, the United States relies on two cases directly addressing the discretionary function exception's application to monitoring for contractual or regulatory compliance: *U.S. v. S.A. Empresa de Viacao Aerea Rio Grandense*, 467 U.S. 797 (1984) ("*Varig Airlines*") and *Sloan v. Dep't. of Hous. & Urban Dev.*, 236 F.3d 756 (D.C. Cir. 2001).

In *Varig Airlines*, the Supreme Court held that FAA employees who conducted compliance reviews of aircraft made policy judgments and were thus covered by the discretionary function exception.  *Varig Airlines*, 467 U.S. at 820. The court reasoned that "[j]udicial intervention in such decisionmaking through private tort suits would require the courts to 'second-guess' the political, social, and economic judgments of an agency exercising its regulatory function.  It was precisely this sort of judicial intervention in policymaking that the discretionary function exception was designed to prevent."  *Id*.

16

In *Sloan*, the D.C. Circuit held that a HUD audit to determine whether a contractor's activities complied with the terms of a contract necessarily implicated public policy decisions and was therefore protected by the discretionary function exception. *Sloan*, 236 F.3d 756, 762-64. The *Sloan* Court noted that "[a]s was true of the first part of the discretionary function test, satisfaction of the second is not limited to actions taken at the policy-planning level." *Id*. at 764. Where "day-to-day 'operational' decisions were undertaken for policy reasons of primary concern to the regulatory agencies," the audits in question fell under discretionary function exception to the FTCA. *Id*.

Plaintiffs counter that, while the United States' decision to enter into the self-determination contract with the Crow Tribe may have been a decision protected by the discretionary function exception, violations of obligations created by the contract were not protected policy judgments. (Doc. 20 at 17.) In support, Plaintiffs liken the Individual Defendants' challenged conduct to that of a failure to supervise a logging operation in *Marlys Bear Medicine v. U.S. ex rel. Sec'y of Interior*, 241 F.3d 1208 (9th Cir.), and a failure to exercise due care in maintaining a lighthouse light in *Indian Towing Co. v. U.S.*, 350 U.S. 61 (1955). (Doc. 20 at 12, 15-17.)

In *Bear Medicine*, the Ninth Circuit addressed whether the government's alleged failure to supervise a logging operation by a private timber company

17

contractor, which resulted in the death of a Blackfeet worker, gave rise to a claim against the United States under the FTCA. *Bear Medicine*, 241 F.3d at 1211-12. Distinguishing between "the decision to take safety measures" and "the negligent implementation of those measures," the Ninth Circuit held that even if the BIA had discretion in monitoring the logging operation, "its actions in carrying out its responsibilities were not protected policy judgments." *Id*. at 1212, 1215.

In *Indian Towing*, plaintiffs filed claims under the FTCA after the Coast Guard's alleged negligent operation of a lighthouse caused a shipping accident. *Indian Towing*, 350 U.S. at 62. The Supreme Court determined that the government was not required to operate a lighthouse; but once it did so, it was obligated to use due care in its operation. *Indian Towing*, 350 U.S. at 69.

Plaintiffs argue that the dispositive factor in both *Bear Medicine* and *Indian Towing* parallels the instant case, in which "the Government had agreed to take on certain duties and then failed to perform those duties." (Doc. 20 at 16.) Although not specified, it is assumed Plaintiffs rely on the BIA's *right* to conduct audits under the Contract as the "*duties*" it agreed to perform.

The Court finds *Bear Medicine* and *Indian Towing* bear little resemblance to the present case. As to *Indian Towing*, the Supreme Court's decision did not even involve application of the discretionary function exception. Rather, the issue before the Court was whether the language in the FTCA "imposing liability 'in the

18

same manner and to the same extent as a private individual under like circumstances . . .' must be read as excluding liability in the performance of activities which private persons do not perform." *Indian Towing Co.*, 350 U.S. at 64. In other words, whether there is liability under the FTCA for the negligent performance of "uniquely governmental functions." *Id.* That is not an issue presented by the United States' motion.

As for *Bear Medicine,* the Ninth Circuit determined that the discretionary function did not apply in cases where the government has undertaken the responsibility for safety. *Bear Medicine*, 241 F.3d at 1215-17. The court applied its "long held doctrine that safety measures, once undertaken, cannot be shortchanged in the name of policy." *Id.* at 1216-17. Thus, "once the Government has undertaken responsibility for the safety of a project, the execution of that responsibility is not subject to the discretionary function exception." *Id.* at 1215.

The present case arises out of allegations of wrongful conduct stemming from a regulatory audit of accounting methods and the performance of contractual obligations. (*See* Doc. 4.) It has nothing to do with the assumption of responsibility for safety.

Moreover, a review of the source and purpose of the Contract demonstrates that the Individual Defendants' audits were susceptible to policy analysis. The Crow Tribe and the federal government voluntarily entered into the Contract for

19

the purpose of providing funding to the Tribe under the Indian Self-Determination and Education Assistance Act, PL-93-638, 25 U.S.C. § 5301 *et seq*.  (Doc. 4 at ¶¶ 1, 13, 15.)  The Individual Defendants' review and resulting Report were undertaken per the terms of the Contract and 25 U.S.C. § 5305.  (*Id.* at ¶ 17-19; 14-1 at 15, § 4.2.)  Integral to the analysis at hand are the underlying Congressional findings and policy of ISDEAA.  25 U.S.C. §§ 5301 – 5302.  In enacting ISDEAA, Congress found that:

> (a)(1) the prolonged Federal domination of Indian service programs has served to retard rather than enhance the progress of Indian people and their communities by depriving Indians of the full opportunity to develop leadership skills crucial to the realization of self-government, and has denied to the Indian people an effective voice in the planning and implementation of programs for the benefit of Indians which are responsive to the true needs of Indian communities; and

> (2) the Indian people will never surrender their desire to control their relationships both among themselves and with non-Indian governments, organizations, and persons.

25 U.S.C. § 5301(a).  Congress then declared the policy of ISDEAA to address these findings:

> (a) Recognition of obligation of United States

> The Congress hereby recognizes the obligation of the United States to respond to the strong expression of the Indian people for self-determination by assuring maximum Indian participation in the direction of educational as well as other Federal services to Indian communities so as to render such services more responsive to the needs and desires of those communities.

(b) Declaration of commitment

The Congress declares its commitment to the maintenance of the Federal Government's unique and continuing relationship with, and responsibility to, individual Indian tribes and to the Indian people as a whole through the establishment of a meaningful Indian self-determination policy which will permit an orderly transition from the Federal domination of programs for, and services to, Indians to effective and meaningful participation by the Indian people in the planning, conduct, and administration of those programs and services. In accordance with this policy, the United States is committed to supporting and assisting Indian tribes in the development of strong and stable tribal governments, capable of administering quality programs and developing the economies of their respective communities.

25 U.S.C. § 5302(a)-(b).

Thus, in enacting ISDEAA, "[t]he United States has made a clear policy decision to diminish regulation of Indian tribal activities." *Lesoeur v. United States,* 21 F.3d 965, 969 (9th Cir. 1994).  As declared by Congress, the purpose of ISDEAA is to maximize Indian participation in the planning and implementation of federally funded programs for the benefit of Indian people.  Nevertheless, Congress also found the need to balance this goal with a degree of oversight to ensure that federal funds are being utilized according to ISDEAA, and the programs are being implemented according to the terms of the contracts and annual funding agreements.  Thus, ISDEAA provides reporting and audit requirements for recipients of financial assistance under the Act.  25 U.S.C. § 5305.

This balancing of the need for maximum Indian participation and control over Indian programs, with the need to monitor the execution of the contracts to

21

ensure they are being implemented according to the goals and purposes of the

ISDEAA, necessarily involve considerations of social, economic, and political

policy.  It need not be shown that the Individual Defendants' actions here were

actually grounded in policy consideration; their decisions must only be susceptible

to policy analysis.  *Vickers v. United States*, 228 F.3d 944, 950–51 (9th Cir. 2000)

("to come within the discretionary function exception, the challenged decision

need not actually be grounded in policy considerations so long as it is, by its

nature, susceptible to a policy analysis.") (quoting *Nurse v. U.S.*, 226 F.3d 996,

1001 (9th Cir. 2000)).

Plaintiffs further argue, however, that the Individual Defendants were not

policy makers, and thus the discretionary function does not apply to their actions.

In Plaintiffs' view, the discretionary function exception "immunizes only high-

level policy decisions, not 'garden-variety' tort claims."  (Doc. 20 at 13, 17.)  But

the Supreme Court has squarely addressed this issue and made clear that the

discretionary function "is not confined to the policy or planning level."  *Gaubert*,

499 U.S. at 325.  The Court explained that application of the exception is

determined by "'the nature of the conduct, rather than the status of the actor.'"  *Id*.

(quoting *Varig Airlines*, 467 U.S. at 813).  The Court also clarified a statement it

previously made in *Dalehite v. United States*, 346 U.S. 15 (1953), which had led to

confusion of this issue.  *Id.* at 326.  In *Dalehite*, the Court made a distinction

between policy decisions and operational actions, stating "[t]he decisions held culpable were all responsibly made at a planning rather than operational level and involved considerations more or less important to the practicability of the Government's fertilizer program." *Dalehite*, 346 U.S. at 42.  The *Gaubert* Court clarified, however, that "the distinction in *Dalehite* was merely a description of the level at which the challenged conduct occurred.  *Gaubert*, 499 U.S. at 326.  There was no suggestion that decisions made at an operational level could not also be based on policy." *Id.*  Thus, Plaintiffs' distinction between high-level policy decisions and operational level "garden-variety tort claims" is unavailing.

The Court therefore recommends that Counts II through VIII against the United States also be dismissed for lack of subject matter jurisdiction under FTCA's discretionary function exception.

## B.  Tort Claims Against the Individual Defendants (Counts II through VIII)

Plaintiffs allege in the Amended Complaint that the Individual Defendants are sued in their official and individual capacities (Doc. 4 at ¶¶ 7, 8), but do not further state which claims are asserted against them individually and which in their official capacities.  Individual Defendants state that "Plaintiffs name all Defendants in connection with their tort claims …, but it is the United States' understanding that Plaintiffs only assert tort claims against the Individual Defendants in their official capacities."  (Doc. 19 at 7.)  But the Amended Complaint does not make

that sufficiently clear, and it is not apparent which parties are included as "Defendants" in Counts II through VIII.

The Individual Defendants further state that the only proper remedy under the FTCA is an action against the United States.  (*Id.*)  While this is true as a general statement, the United States has not filed a certification that the Individual Defendants were acting within the scope of their employment or office or sought to be substituted for the Individual Defendants for claims brought under the FTCA, as required by the Westfall Act.

The Westfall Act amended the FTCA, and provides that "[t]he remedy against the United States provided by sections 1346(b) and 2672 of this title … is exclusive of any other civil action or proceeding for money damages by reason of the same subject matter against the employee whose act or omission gave rise to the claim …"  28 U.S.C. 2679(b)(1).  In short, "[t]he FTCA immunizes federal employees from individual liability for an 'action [that] is properly against the United States under the FTCA.'"  *Beebe v. United States*, 721 F.3d 1079, 1084 (9th Cir. 2013) (quoting *Meridian Int'l Logistics, Inc. v. United States*, 929 F.2d 740, 743 n. 1 (9th Cir. 1991)).

The Westfall Act also outlines the procedure for invoking the immunity provided by the FTCA, and for substituting the United States as the proper party in the action.  When a federal employee is sued for a wrongful or negligent act, the

employee must deliver copies of the summons and complaint to a supervisor to be

forwarded to the local United States Attorney, the Attorney General, and to the

head of his employing federal agency.  28 U.S.C. § 2679(c); 28 C.F.R. § 50.15(a).

The Attorney General then certifies whether the employee was acting within the

scope of his or her employment at the time of the event giving rise to the claim.  *Id.*

Upon certification, the United States is substituted as a party and the employee

dismissed from the action, as provided in 28 U.S.C. § 2679(d)(1):

> Upon certification by the Attorney General that the defendant employee
> was acting within the scope of his office or employment at the time of
> the incident out of which the claim arose, any civil action or proceeding
> commenced upon such claim in a United States district court shall be
> deemed an action against the United States under the provisions of this
> title and all references thereto, and the United States shall be substituted
> as the party defendant.

This procedure has not been completed here.  At present, it appears that

Plaintiffs' tort claims in Counts II through VIII have been asserted against

"Defendants" without limitation, and that the United States has not been

substituted under the Westfall Act.  The Individual Defendants' Motion to Dismiss

also does not appear to extend to Counts II through VIII, and therefore, those

counts remain pending against the Individual Defendants.

## C. *Bivens* Claims Against the Individual Defendants (Count I)

The Individual Defendants move to dismiss Plaintiffs' *Bivens* claim in Count

I of the Amended Complaint.  (Doc. 18.)  Plaintiffs allege the Individual

25

Defendants violated Plaintiffs' constitutional rights under the First Amendment, as well as deprived them of their property interest in employment and procedural due process under the Fifth Amendment.  (Doc. 4 at ¶¶ 137, 140-141.)  Specifically, Plaintiffs claim the Individual Defendants retaliated against them for raising a question as to whether the BIA was failing to protect Crow children and prisoners—an expression of Free Speech.  (*Id.* at ¶¶ 26-28, 137.)  Second, Plaintiffs allege the Individual Defendants intended to cause them to lose their jobs, hence deprive them of their property interest in employment.  (*Id.* at ¶ 140.)  Last, Plaintiffs allege the Individual Defendants' actions resulted in their termination and deprived them of procedural due process.  (*Id.* at ¶ 141.)

The Individual Defendants argue that Plaintiffs have failed to state a cognizable claim under *Bivens* because this case presents a new context and special factors preclude the extension of *Bivens*.

A *Bivens* claim is an implied right of action for damages against a government official alleged to have violated an individual's constitutional rights. *Ziglar v. Abbasi*, 137 S.Ct. 1843, 1854 (2017).  The Supreme Court first acknowledged the claim in the context of a Fourth Amendment search and seizure violation.  *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).  The Court has since recognized *Bivens* claims in only two other cases: a Fifth Amendment due process claim based on gender discrimination, and

an Eighth Amendment cruel and unusual punishment claim for failure to provide a

prisoner with adequate medical treatment.  See *Davis v. Passman*, 442 U.S. 228

(1979) and *Carlson v. Green*, 446 U.S. 14 (1980), respectively.  Apart from these

three cases, the Supreme Court has consistently declined to extend *Bivens* to other

constitutional contexts, and it has now been four decades since it has done so.  As

explained in *Abbasi*, "[i]n cases decided after *Bivens*, and after the statutory

implied cause-of-action cases that *Bivens* itself relied upon, the Court adopted a far

more cautious course before finding implied causes of action."  *Abassi*, 137 S.Ct.

at 1855-57.

The Supreme Court recently reaffirmed and underscored its hesitation to

extend *Bivens* in *Ziglar v. Abbasi*.  In *Abbasi*, the Court observed that it "has made

clear that expanding the *Bivens* remedy is now a disfavored judicial activity."

*Abbasi*, 137 S.Ct. at 1857 (internal quotations omitted.)  The Court went so far as

to suggest the three recognized *Bivens* cases may have resulted differently had they

been decided today.  *Id.* at 1856.  Using judicial power to create such a remedy, the

Court said, is a "significant step under separation-of-powers principles."  *Id.*  The

Court made clear "[i]t is not necessarily a judicial function to establish whole

categories of cases in which federal officers must defend against personal liability

claims in the complex sphere of litigation, with all of its burdens on some and

benefits to others."  *Id.* at 1858.

27

In determining whether to extend an implied cause of action under the Constitution, "separation-of-powers principles are or should be central to the analysis." *Id.* at 1857. The analysis focuses on answering the question, "who should decide whether to provide for a damages remedy, Congress or the courts?" *Id.* "The answer most often will be Congress." *Id.*

The Court also articulated a two-part test to determine whether *Bivens* should be extended. *Id.* at 1859. The test first focuses on whether a case presents a new *Bivens* context. *Id.* "If the case is different in a meaningful way from previous *Bivens* cases decided by this Court, then the context is new." *Id.* In that event, the court should conduct "a special factors analysis" to determine whether a *Bivens* remedy should be implied. *Id.* at 1860. Generally, a special factors analysis asks, "whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." *Id.* at 1858. If a Court must "hesitate before answering that question in the affirmative" there are special factors counseling hesitation. *Id.* at 1858. Where special factors counsel hesitation, a *Bivens* remedy is not available. *Id*. at 1859.

Thus, whether a *Bivens* remedy may lie for Plaintiffs' constitutional claims requires the Court to address whether they present a new *Bivens* context; and if so,

whether special factors counsel hesitation in expanding the remedy to Plaintiffs' claims.

### 1.    Step One: New Context

Plaintiffs advance arguments in briefing for two of the three alleged constitutional violations: First Amendment retaliation and Fifth Amendment procedural due process.  (*See generally* Doc. 20 at 17- 24.)  Plaintiffs do not argue in support of their Fifth Amendment property interest claim.  (See *Id.*)  In any event, the Court finds that all three constitutional allegations are new contexts from those recognized by the Supreme Court in *Bivens* (4th Am.), *Davis* (5th Am.), and *Carlson* (8th Am.).  None of the previous cases involved First Amendment claims, and only *Davis* considered the Fifth Amendment.  See *Davis v. Passman*, 442 U.S. 228 (1979).  But that case involved a remedy for gender discrimination through the equal protection component of the Fifth Amendment's Due Process Clause.  *Id.* The instant case does not involve gender discrimination or equal protection.

Plaintiffs' *Bivens* claim arises out of a routine review of a Crow Tribe – U.S. Government self-determination contract designed to support and assist the Crow Tribe with the development of a strong, stable and independent judiciary.  (*Cf.* Doc. 14-1 at 11 and 25 U.S.C. §§ 5301-5302.)  The Individual Defendants acted as the auditor/reviewers of contract performance, and in so doing Plaintiffs allege their constitutional rights were violated.  None of the Supreme Court's three

previously recognized *Bivens* cases are remotely similar to this situation.[4]  Thus, this case plainly arises in a meaningfully different context.

Accordingly, the Court finds that Plaintiffs' alleged constitutional violations are new *Bivens* contexts and require a special factors analysis.

## 2.    Step Two: Special Factors

At step two in the *Abbasi* analysis, the Court is required to determine whether there are "special factors counseling hesitation in the absence of affirmative action by Congress."  *Abbasi*, 137 S. Ct. at 1857 (quoting *Bivens*, 403 U.S. at 396.)  Individual Defendants assert that there are special factors present here and focus on the argument that Plaintiffs had an alternative remedy.  (Doc. 19 at 10.)  "[I]f there is an alternative remedial structure present in a certain case, that alone may limit the power of the judiciary to infer a new *Bivens* cause of action."  *Vega v. U.S.*, 881 F.3d 1146, 1154 (9th Cir. 2018) (citing *Abbasi*, 137 S.Ct. at 1858).  The Individual Defendants assert that Plaintiffs had the opportunity to send

---

[4] Plaintiffs collect numerous circuit court cases in support of their argument that their claims are not new *Bivens* contexts.  *See* Doc. 20 at 19, FN 3-5.  But Plaintiffs overlook the Supreme Court's framing of the "proper test."  "If the case is different in a meaningful way from previous *Bivens* cases *decided by this Court*, then the context is new."  *Abbasi*, 137 S.Ct. at 1859 (emphasis added).  The Supreme Court clearly emphasized that its cases set established contexts, not circuit courts.  *Id.* at 1860 ("Those claims bear little resemblance to the three *Bivens* claims the Court has approved in the past.").  Further, it appears that all of the collected cases Plaintiffs proffer involve law enforcement or prosecution, which in and of themselves are in a different context from the instant case of civilian contract review.

a rebuttal letter to the Reports' findings to the Tribal Chairman; they were given the opportunity to attend a hearing before the Tribe's Judicial Ethics Board; and they could also pursue state law tort remedies under the FTCA.  (Doc. 19 at 10.)

There is no evidence presently before the Court to show that any of these avenues provided an alternative remedial structure.  Regarding the letter to the Tribal Chairman, there is no evidence to indicate that simply writing a letter to the Tribal Chairman in response to the Report provided any meaningful process for the initiation, review, and resolution of Plaintiffs' claims against the Individual Defendants.  In fact, there is no indication that the Tribal Chairman, or anyone else, was required to even consider the letter, respond to the letter, or provide any process for the investigation or resolution of Plaintiffs' claims.

The same is true with respect to the hearing before the Tribe's Judicial Ethics Board.  From what little is revealed by the Amended Complaint, this was not a process to consider Plaintiffs' claims against the Individual Defendants.  Rather, it appears the hearing was held in connection with a separate Tribal proceeding initiated against Plaintiffs by an Associate Judge on the Crow Tribal Court, which did not involve the Individual Defendants or the DOI Report.  There is no evidence to show the nature and scope of the proceedings, and what due process Plaintiffs may have been afforded in defending the allegations against them.  Further, there is no indication there was any process in place for the

31

initiation of a complaint by Plaintiffs relating to the actions of the Individual

Defendants, for the investigation of the complaint by the Tribe or the DOI, or any

provision in place to provide any remedial measures as a result of that process.

Finally, the FTCA plainly did not provide an alternative remedy for

Plaintiffs' claims against the Individual Defendants.  As discussed above, the

Individual Defendants are immune from liability under the Westfall Act for acts

committed within the scope of their office or employment.  28 U.S.C. § 2679.  As

further discussed, any action against the United States based on the Individual

Defendants actions is also foreclosed by the intentional torts and discretionary

function exceptions.  Therefore, the FTCA can hardly be considered an adequate

alternative remedy in these circumstances.

Nevertheless, other special factors counsel against extension of a *Bivens*

remedy in this case.  As discussed, central to the special factors analysis are

separation-of-powers principles.  *Hernandez v. Mesa*, 140 S.Ct. 735, 743 (2020).

"[I]f there are sound reasons to think Congress might doubt the efficacy or

necessity of a damages remedy as part of the system of enforcing the law and

correcting a wrong, the courts must refrain from creating the remedy in order to

respect the role of Congress in determining the nature and extent of federal-court

jurisdiction under Article III."  *Abassi*, 137 S.Ct. at 1858.

Defendants assert that extending *Bivens* here would "interfere with federal executive employees' execution of their duties, thus undermining separation of powers" between the Executive and Judicial Branches.  (Docs. 23 at 9; 25 at 4, 9.) The Court agrees.  As discussed above, in enacting ISDEAA Congress attempted to strike a careful balance between providing Indian tribes' autonomy in implementing and managing programs for their benefit, and at the same time providing the federal government with the ability to monitor those programs for compliance with federal law and the terms of the self-determination contracts. Providing a damages remedy for tribal employees operating under a self-determination contract against the individual auditors of those programs may upset that balance and interfere with the ability to effectively monitor those programs.  In short, subjecting auditors of those programs to personal liability suits may well have a chilling effect on their willingness or ability to candidly assess a tribe's performance of the contracts.

In addition, the Supreme Court also emphasized that there are many economic and governmental concerns to consider in determining whether to extend a Biven's remedy.  *Abbasi*, 137 S.Ct. at 1856.  The Court made clear that the "decision to recognize a damages remedy requires an assessment of its impact on governmental operations systemwide."  *Id.* at 1858.  The Court pointed out that "[c]laims against federal officials often create substantial costs, in the form of

33

defense and indemnification," and that Congress "has a substantial responsibility to determine whether, and the extent to which, monetary and other liabilities should be imposed upon individual officers and employees of the Federal Government." *Id*. at 1856.  The Court said the time and administrative costs of the litigation process are "significant factors to be considered."  *Id.*

These concerns are particularly applicable here.  Taking into consideration all of the self-determination contracts that are in existence throughout the United States, the number of tribal employees who may be operating under self-determination contracts, and the number of federal employees who may be charged with monitoring the performance of the contracts, the potential liability exposure to the United States and its employees would be substantial.  And accordingly, the time and costs to the government and individual employees who administer those contracts in defense and indemnification of claims by tribal employees would undoubtedly be burdensome.  This consideration is even more significant if the remedy is extended not only to self-determination contracts but to all government contractors.  As this Court has commented when considering whether to extend a *Bivens* remedy to government contractors, exposing federal government officials to individual liability for such claims "would, at the risk of over-statement, have breathtaking implications of the day-to-day functioning and activities of the federal government, and would be contrary to the spirit of the *Bivens* action as originally

34

conceived." *Ogden v. Draper*, 2014 WL 12788193 * 5 (D. Mont. March 21, 2014).

Finally, it should be noted that Congress did not provide an individual remedy under ISDEAA.  In *Abassi*, the Supreme Court recognized "in any inquiry respecting the likely or probable intent of Congress, the silence of Congress is relevant …." *Abassi*, 137 S.Ct. at 1862.  In that case, for example, the Court pointed out that Congressional interest in the response to the September 11 terrorist attack had been "frequent and intense," yet Congress had not seen fit to extend the types of remedies the alien detainees sought in that case.  *Id.*

In this case, Congress established a comprehensive legislative scheme for the creation and implementation of tribal programs for services previously performed by the federal government.  As part of the legislation, Congress provided for a civil action for damages or injunctive relief by Indian Tribes or tribal organizations against the Secretary of the Interior based on any action by an officer or employee of the United States or any agency thereof.  25 U.S.C. § 5331; see also *Demontiney v. U.S. ex rel. Dept of Interior, Bureau of Indian Affairs*, 255 F.3d 801, 805 (9th Cir. 2001) ("The ISDEAA's waiver of federal sovereign immunity is limited to 'self-determination contracts' entered into by Indian tribes or tribal organizations and the government.")  But Congress did not similarly find

it appropriate to establish a remedy for employees of tribes or tribal organizations based on the actions of officers and employees of the United States.

These factors certainly do more than cause the Court to hesitate in finding the judiciary well suited to determine that a damages remedy should be extended. Where, as here, "an issue involves a host of considerations that must be weighed and appraised, it should be committed to those who write the laws, rather than those who interpret them." *Abassi*, 137 S.Ct. at 1857 (internal quotations and citations omitted). As in "most instances . . . the Legislature is in the better position to consider if the public interest would be served by imposing a new substantive legal liability." *Id.* (internal quotations omitted).

Plaintiffs assert, however, that this situation is similar to *Lanuza v. Love*, 899 F.3d 1019 (9th Cir. 2018), where the Ninth Circuit extended a *Bivens* remedy after the Supreme Court's decision in *Abbassi*. (Doc. 20 at 18.) But *Lanuza* substantially differs from this case in significant respects and does not compel the extension of a *Bivens* remedy here.

In *Lanuza*, a government immigration attorney forged a voluntary departure form in the name of an alien resident seeking citizenship. *Lanuza*, 899 F.3d at 1021-23. The form was critical to the plaintiff being able to stay in the United States, since a signed form effectively barred him from obtaining lawful permanent residence status to which he was otherwise entitled. *Id.* at 1022. The forgery was

36

subsequently discovered, and the immigration attorney was ultimately prosecuted and pleaded guilty to deprivation of rights under color of law pursuant to 18 U.S.C. § 242. *Id.*

Despite the Supreme Court's cautionary instructions in *Abbas*, the Ninth Circuit extended a *Bivens* remedy under the circumstances of that case. The court made clear, however, that it was extending the remedy only under the "narrow and egregious facts" presented. *Id*. at 1021. That is, "a plaintiff seeking a *Bivens* remedy under this theory must allege sufficient facts to show that a federal official willfully submitted falsified evidence and the submission of this evidence resulted in a complete bar to relief to which the individual was otherwise entitled under congressionally enacted laws." *Id.* at 1033. Here, the Plaintiffs allege the Individual Defendants submitted false accusations in the Report. (*See e.g.* Doc. 4 at ¶¶ 22, 24.) Unlike *Lanuza*, however, they have not alleged facts to show that this resulted in a complete bar to any relief they were otherwise entitled under congressionally enacted laws.

In addition, unlike the Court's findings here, the Ninth Circuit found that there were no special factors in *Lanuza* which counseled against extending the remedy. Relevant to the analysis in this case, the court in *Lanuza* found that the Executive Branch would not be burdened to a significant degree by extending the remedy. *Lanuza*, 899 F.3d at 1028-29. The *Lanuza* Court pointed out that it was a

"straightforward case against a single low-level federal officer," in which the facts of the case had already been made public by the government itself, and thus would "not require unnecessary inquiry or discovery into government deliberations or policy making," or other sensitive information. *Id.* at 1030. Additionally, the court "[did] not foresee a 'deluge' of potential claimants" seeking a similar *Bivens* remedy. *Id.* at 1033.

The same assurances are not present in this case. Allowing a *Bivens* remedy here would make the remedy available for similar claims by any tribal employee operating under a self-determination contract who disagrees with findings from a federal audit. The resulting litigation would likely create a heavy burden to defend against personal liability claims arising out of ISDEAA-mandated monitoring, including discovery of the reviewers' deliberative process.

The Ninth Circuit in *Lanuza* also said that it was not creating a private remedy under the Immigration and Nationality Act ("INA") where a cause of action does not exist. *Id.* at 1031. It found that, while the INA did not expressly provide a damages remedy, the language of the INA "demonstrates Congress contemplated civil actions would be maintained against … federal immigration officers … when their actions allegedly violate the Constitution or other laws." *Id.* As discussed above, the same is not true here. ISDEAA does not contain any

language suggesting a private remedy for employees of tribes or tribal organizations for alleged wrongful conduct.

Therefore, the Court finds that, even when viewing the allegations in the light most favorable to Plaintiffs, special factors counsel against expanding *Bivens* here.[5]

## IV.    Conclusion

In sum, the Court finds that the Plaintiffs' claims against the United States in Counts II through VIII of Amended Complaint fail for lack of subject matter jurisdiction under the FTCA's intentional torts exception and the discretionary function exception, and should be dismissed under Fed. R. Civ. P. 12(b)(1). The Court further finds that Plaintiffs fail to state a claim upon which relief may be granted against the Individual Defendants in Count I, and the claim should be dismissed under Fed. R. Civ. P. 12(b)(6). To the extent Plaintiffs assert tort claims against the Individual Defendants in Counts II through VIII, those claims remain pending.

---

[5] The Individual Defendants also argue that qualified immunity shields them from liability. (Doc. 19 at 12-16.) Having concluded that a *Bivens* remedy does not extend to the facts and circumstances of this case, it is not necessary to address the Individual Defendants' qualified immunity defense.

Therefore, IT IS RECOMMENDED that the United States' Motion to Dismiss (Docs. 13) should be **GRANTED,** and the Individual Defendants' Motion to Dismiss (Doc. 18) should be **GRANTED** as to Count I.

**NOW, THEREFORE, IT IS ORDERED** that the Clerk shall serve a copy of the Findings and Recommendation of United States Magistrate Judge upon the parties.  The parties are advised that pursuant to 28 U.S.C. § 636, any objections to the findings and recommendation must be filed with the Clerk of Court and copies served on opposing counsel within fourteen (14) days after entry hereof, or objection is waived.  D. Mont. Local Rule 72.3.

**IT IS ORDERED**.

DATED this 8th day of September, 2020.

_____
TIMOTHY J. CAVAN
United States Magistrate Judge